# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

PAMELA R. ADAMS                    *      CIVIL ACTION NO.  07-1029

VERSUS                             *      JUDGE JAMES

MICHAEL J. ASTRUE,                 *      MAGISTRATE JUDGE HAYES
COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION

### REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social

security disability benefits.  The district court referred the matter to the undersigned United

States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of

the Commissioner be **REVERSED and REMANDED for further proceedings.**

### Background & Procedural History

Pamela R. Adams filed the instant application for Disability Insurance Benefits on

February 27, 2003.  (Tr. 49, 62-64).  She alleged disability since March 18, 2002, due to back,

leg, and neck pain, tingling, numbness, anxiety, high blood pressure, and muscle pain.  (Tr. 62,

69).  The claim was denied at the initial stage of the administrative process.  (Tr. 49, 52-55).

Thereafter, Adams requested and received a September 21, 2004, hearing before an

Administrative Law Judge ("ALJ").  (Tr. 33-48).[1]  However, in an April 27, 2005, written

decision, the ALJ found that Adams was not disabled under the Act.  (Tr. 11-21).  Adams

_____

    [1] The ALJ held a supplemental hearing on March 17, 2005.  (Tr. 261-270).

unsuccessfully sought review before the Appeals Council, and thereafter filed suit in this court on September 21, 2005.  (Tr. 5-7); *Adams v. Smith v. Commissioner, Social Security Administration*, Civil Action Number 05-1664 (W.D. La.).  On July 21, 2006, the court reversed the Commissioner's decision and remanded the matter for further proceedings to afford the Commissioner an opportunity to address evidence submitted by plaintiff's treating physician. (*See*, July 21, 2006, Judgment and June 22, 2006, Report and Recommendation; Tr. 291-298).

Meanwhile, on September 24, 2004, Adams filed a new application for benefits.  (*See*, Tr. 274).  Upon remand, the Appeals Council consolidated the new application with the February 27, 2003, claim remanded by the district court.  (Tr. 302-303).  The Appeals Council then remanded the consolidated applications to an ALJ to hold a new hearing and to issue a new decision in the matter.  *Id*.  Accordingly, a third hearing was held before an ALJ on December 21, 2006.  (Tr. 319-328).  On February 16, 2007, the ALJ denied Adams' applications, finding at Step Five of the sequential evaluation process that she was able to make an adjustment to work that exists in substantial numbers in the national economy.  (Tr. 271-282). The Appeals Council took no further action; thus the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1484.

On June 14, 2007, Adams sought review before this court.  She alleges the following errors:

> (1)     the ALJ's finding that plaintiff could perform medium work is not supported by substantial evidence; and
>
> (2)     the ALJ failed to articulate a basis for rejecting the opinions of plaintiff's treating physicians.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the

ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying the improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. at 401. While substantial evidence lies somewhere between a scintilla and a preponderance, substantial evidence clearly requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  Conversely, a finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Secretary.  *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

### Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).   Based on a claimant's age, education, and work experience, the SSA utilizes a

3

broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1)     An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)     An individual who does not have a "severe impairment" of the requisite duration will not be found to be disabled.

(3)      An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See, Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001);  20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated.  *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  If at any

4

point during the five-step review the claimant is found to be disabled or not disabled, that finding

is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

<u>**Analysis**</u>

The ALJ found at Step Two of the sequential evaluation process that Adams suffers from

severe impairments of chronic low back and neck pain; probable fibromyalgia; arterial

hypertension; pain disorder associated with psychological factors and a general medical

condition; depressive disorder, NOS; sleep disorder in remission with medication; dementia,

NOS; and rule out panic disorder versus seizure disorder.  (Tr. 277).  The ALJ concluded,

however, that these impairments were not severe enough to meet or medically equal any of the

impairments listed in Appendix 1, Subpart P, Regulations No. 4, at Step Three of the process.  *Id*.

The ALJ next determined that Adams retained the residual functional capacity to perform

a full range of medium work, reduced by a moderately limited ability to understand, remember

and carry out simple instructions and to make judgments on simple work-related decisions; but

markedly limited in her ability to understand, remember and carry out detailed instructions.  (Tr.

277).  She is also markedly limited in her ability to interact appropriately with the general public,

but moderately limited in the ability to interact appropriately with supervisors and peers.  *Id*.

Finally, Adams is moderately limited in the ability to respond appropriately to work pressures in

a usual work setting and to changes in a routine work setting.  (Tr. 277). [2]

---

[2]  Medium work is defined and explained by Social Security Ruling 83-10:
    [t]he regulations define medium work as lifting no more than 50
    pounds at a time with frequent lifting or carrying of objects weighing
    up to 25 pounds.  A full range of medium work requires standing or
    walking, off and on, for a total of approximately 6 hours in an 8-hour
    workday in order to meet the requirements of frequent lifting or
    carrying objects weighing up to 25 pounds.  As in light work, sitting
    may occur intermittently during the remaining time.  Use of the arms
    and hands is necessary to grasp, hold, and turn objects, as opposed to

In contrast to the ALJ's residual functional capacity assessment, plaintiff's treating physician, Edward O. Coleman, O.D., opined that her impairments effectively incapacitated her from any type of work.  On the other hand, the consultative examiner, David Hebert, M.D., found that plaintiff's impairments did not prevent her from routinely walking, sitting, standing, and carrying for an eight hour day.  Plaintiff's two assignments of error essentially challenge the ALJ's decision to credit the findings of the consultative physician in lieu of the functional limitations recognized by plaintiff's treating physician.

The record reflects that Dr. Coleman treated plaintiff from at least July 2001 through December 2006.  (*See*, Tr. 153, 317-318).[3]  As early as September 2002, Dr. Coleman noted that plaintiff had experienced pain on and off for years which had progressively worsened.  (Tr. 115).  He observed that the pain was getting to the point that it was very difficult for her to function at

the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.

The considerable lifting required for the full range of medium work usually requires frequent bending-stooping.  (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist).  Flexibility of the knees as well as the torso is important for this activity.  (Crouching is bending both the legs and spine in order to bend the body downward and forward).  However, there are a relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semi-skilled jobs).  In most medium jobs, being on one's feet for most of the workday is critical.  Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

Social Security Ruling 83-10.

[3]  Dr. Coleman is board-certified with the American College of General Practitioners in Osteopathic Medicine and Surgery.  (Tr. 250).  An osteopath is an acceptable medical source.  20 C.F.R. § 404.1513(a).

all. *Id*.[4]

On October 17, 2002, a neurosurgeon, Carlton Russ Greer, M.D., examined plaintiff upon referral by Dr. Coleman.  (Tr. 175-178).  Dr. Greer noted that Adams experienced limitation to range of motion consistent with cervical degenerative changes.  *Id*.  She also exhibited tenderness to palpation in the cervical, trapezius, lumbar, and lumbosacral regions.  *Id*.  Her gait was normal and straight leg test was negative.  *Id*.  Following a myelogram and other diagnostic studies, Greer diagnosed "some mild lateral recessed stenosis at L4-S5 with L5-S1 spondylolysis with grade I spondylolisthesis."  (Tr. 179).

On November 15, 2002, a pain care specialist, Vincent Forte, M.D. examined Adams at the request of Dr. Bernie McHugh.  (Tr.  169-172).  During the examination, plaintiff stated that she had been in a motor vehicle accident two years earlier.  *Id*.  She went to physical therapy, but it did not help.  *Id*.  She described her pain as constant across her lower back.  *Id*.  She also occasionally experienced pain down her legs.  *Id*.  Walking, sitting, and standing for long periods increased her pain which she rated as a 45 out of 100.  *Id*.  Upon examination, Adams exhibited limited range of motion in her neck with extension.  *Id*.  She was also slightly limited with rotation and tilt bilaterally.  *Id*.  She had mild to moderate midline cervical tenderness.  *Id*.  Forte also noted mild to moderate cervical paraspinous and facet tenderness.  *Id*.  Her reflexes of the upper and lower extremities were 2+ bilaterally.  *Id*.  Sensory examination was within normal limits in all dermatones.  *Id*.  Straight leg raising was positive for lower back pain on the left and negative on the right.  *Id*.  Her gait was within normal limits.  *Id*.  She could bend to within five

---

[4]  Dr. Coleman's notes from January 10, 2003, indicate that plaintiff was doing better overall.  (Tr. 110).  She had pain in her right lower back radiating into her right hip.  *Id*. Coleman diagnosed sinusitis, low back pain secondary to grade I spondylolisthesis of L5 on S1, and bilateral neural foraminal stenosis at L5.  *Id*.

to six inches of the floor, but exhibited lower back pain with back extension.  *Id*.  Waddell's axial loading sign was positive for report of left leg pain.  *Id*.  Motor strength was 5/5 in all extremities.  *Id*.  Numerous sites were tender.  *Id*.  Forte assessed chronic lower back and bilateral leg pain with MRI evidence for grade I L5-S1 spondylolisthesis with bilateral neural foraminal narrowing and small central disk protrusion; chronic neck pain with symptoms most suggestive of cervical facet arthropathy and myofascial pain; depression with evidence on examination for symptom magnification; sleep disturbance; and hypertension.  *Id*.

Dr. Forte's notes from February 18, 2003, reveal that plaintiff's chief complaint was low back pain with some right hip and leg pain.  (Tr. 161-162).  He stated that she had positive results from physical therapy and continued daily stretching exercises and walking.  *Id*.[5]  Nonetheless, her pain remained a constant, aching pain which she rated as a 40/100.  *Id*.  Motor and sensory examination of her upper and lower extremities was grossly intact.  *Id*.  However, she experienced very mild midline lumbosacral tenderness to palpation as well as moderate paravertebral tenderness.  *Id*.  Sacroiliac joint tenderness on the right was also elicited upon palpation.  *Id*.  Forte diagnosed spondylolisthesis, lumbar spinal stenosis, radiculitis, and chronic low back pain with some myofascial components.  *Id*.

Dr. Coleman's Office Visit notes from July 10, 2003, indicate that plaintiff was concerned about ongoing aches and pains in her joints, muscles, back and neck.  (Tr. 221).  He stated that she was not getting much relief from injections.  *Id*.  Her extremities were tender to palpation.  *Id*.  Coleman diagnosed hypertension, degenerative osteoarthritis of the cervical spine,

---

[5]  However, the physical therapist's February 13, 2003, notes state that plaintiff had made no progress since starting physical therapy, and that her pain had increased.  (Tr. 210).  The physical therapist discharged Adams from treatment, but urged her to continue her home exercise program.  *Id*.

and fibromyalgia.  *Id.*[6]

One month later, on August 5, 2003, David Hebert, M.D., examined plaintiff at the request of Disability Determination Services.  (Tr. 180-183).  Hebert noted that Adams complained of severe arthritis in the lower back and neck areas for the past two years, probable fibromyalgia, generalized arthritis, anxiety, depression, and high blood pressure.  *Id.*  She described severe low back pain with frequent radiation down the right leg, and difficulty sitting or standing for more than 30 minutes per day.  *Id.*  Her fingers, hands, and arms became numb and hurt all of the time.  *Id.*  She complained of frequent decreased vision and frequent headaches.  *Id.*  Her neck was always painful and stiff with decreased motion.  *Id.*  Upon examination, her neck demonstrated a full range of motion.  *Id.*  She had extreme tenderness of the trapezius and muscles about the scapula.  *Id.*  The muscles appeared to be in spasm with several trigger points on the trapezius, supraspinatus and infraspinous muscles.  *Id.*  She could flex the lumbar spine to 90 degrees and extend it to 20 degrees.  *Id.*  Straight leg raising was essentially negative bilaterally.  *Id.*  Her gait and station were completely normal, without assistive devices.  *Id.*  She had no difficulty toe/heel walking.  *Id.*  There was no evidence of peripheral edema, peripheral vascular disease, muscle atrophy, deformities, or joint swelling.  *Id.*  All peripheral joints exhibited a full range of motion.  *Id.*  Strength was 5/5 in all extremities.  *Id.*  Hebert diagnosed chronic low back pain due to degenerative disc disease at L5-S1 level with grade I spondylolisthesis with chronic low back pain and right leg sciatica, but with no significant impairment of function; chronic neck pain of uncertain etiology, but with no significant impairment of function; probable fibromyalgia primarily responsible for her pain;

---

[6] Dr. Forte also diagnosed fibromyalgia, sleep disturbance, and depression.  (October 1, 2003, Follow Up Visit; Tr. 225).

9

arterial hypertension, adequately controlled; and history of anxiety and depression without psychosis currently in remission and well-treated.  *Id*.  Hebert opined that he saw no reason why plaintiff could not routinely walk, sit, stand, and carry for an eight hour day.  *Id*.  Mentally, she was alert and quite functional.  *Id*.[7]

Over one and one-half years later, on May 6, 2005, Dr. Coleman wrote a To Whom it May Concern letter wherein he recounted plaintiff's medical history.  (Tr. 250-252).  He stated that Adams' condition had steadily deteriorated over the last five to six years.  *Id*.  She exhibited pain in multiple areas of her body with multiple tender points.  *Id*.  Coleman stated that Adams continues to suffer from chronic fatigue and cannot sit or stand for long periods of time at all.  *Id*. He opined that she may be active for two hour periods, but she has to sit, stand and walk some during that period. *Id*.  She cannot remain in one position for an extensive period of time.  *Id*. She has difficulty concentrating and forgets frequently.  *Id*.  She experiences pain, sensitivity, and tenderness in her muscles, ligaments, tendons, and generally in her extremities.  *Id*.

He opined that her impairments were severe, and that she needed to lie down and recover from even short episodes of activity.  *Id*.  Coleman noted that in over four years, Adams had gone from 146 pounds to 118 pounds.  *Id*.  The weight loss was attributable to her chronic pain and problems with fibromyalgia and myofascial pain.  *Id*.  He stated that she suffers from severe fibromyalgia which also affects her memory.  *Id*.[8]  She has great difficulty performing repetitive tasks and sitting and standing for long periods of time.  *Id*.  Coleman opined that Adams was not

---

[7]  On August 20, 2003, an unknown, non-examining agency physician (likely Charles Black M.D.) completed a physical residual functional capacity assessment indicating that plaintiff could perform work at the medium exertional level.  (Tr. 198-204).

[8]  She exhibited multiple trigger points and tender points.  *Id*.

able to maintain a normal level of employment.  *Id.*[9]

On December 14, 2006, Dr. Coleman completed a Medical Statement Regarding Physical Abilities and Limitations.  (Tr. 317-318).  He indicated that Adams can work for zero hours per day.  *Id.*  She can stand for 15 minutes at a time, but zero during a workday.  *Id.*  She can sit for 30 minutes at a time, but zero during a workday.  *Id.*  She can occasionally lift up to twenty pounds, and frequently lift five pounds.  *Id.*  She can occasionally perform postural activities, but can never work around dangerous machinery.  *Id.*  She cannot tolerate dust, smoke, or fumes.  *Id.*  Adams also needs to lie down frequently during an eight hour workday.  *Id.*  Coleman noted that Adams' condition had deteriorated and worsened over the last several months.  *Id.*

Obviously, the limitations recognized by plaintiff's treating physician are inconsistent with the ALJ's residual functional capacity assessment, and if credited would undermine the ALJ's decision.  Accordingly, the ALJ endeavored to discount Dr. Coleman's assessment(s).  In this context, the Fifth Circuit has held that

> "ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985). The treating physician's opinions, however, are far from conclusive. "[T]he ALJ has the sole responsibility for determining the claimant's disability status." *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990).
>
> Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony. The good cause exceptions we have recognized include disregarding

---

[9]  On March 15, 2005, plaintiff's chiropractor, Michael T. Harvey, completed a disability questionnaire wherein he stated that Adams was not capable of working in any capacity.  (Tr. 248-249).  Of course, a doctor's statement that a claimant is "disabled" or "unable to work" is afforded no special significance under the regulations.  20 C.F.R. § 404.1527(e)(1); *Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003).

11

statements that are brief and conclusory, not supported by
medically acceptable clinical laboratory diagnostic techniques, or
otherwise unsupported by the evidence. *Scott*, 770 F.2d at 485. In
sum, the ALJ "is entitled to determine the credibility of medical
experts as well as lay witnesses and weigh their opinions
accordingly." Id.; see also 20 C.F.R. § 404.1527(c)(2) ("If any of
the evidence in your case record, including any medical opinion(s),
is inconsistent with other evidence or is internally inconsistent, we
will weigh all the other evidence and see whether we can decide
whether you are disabled based on the evidence we have.").

*Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994).

The instant ALJ discounted Dr. Coleman's assessment(s) because his findings were

purportedly not supported by the objective medical evidence or plaintiff's testimony.  (Tr. 280).

However, insofar as plaintiff's pain stemmed from orthopedic complaints, the objective tests

support cognizable impairments.  (*See, e.g.*, Tr. 113-114, 140, & 179).  Moreover, to the extent

that plaintiff's pain is caused by fibromyalgia, the court observes that there are no objective tests

to conclusively confirm fibromyalgia.  *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir.

2003) (citations omitted).  Rather,

[f]ibromyalgia is a disorder defined by the American College of Rheumatology
(ACR) and we recognize it as medically determinable if there are signs that are
clinically established by the medical record. The signs are primarily the tender
points. The ACR defines the disorder in patients as "widespread pain in all four
quadrants of the body for a minimum duration of 3 months and at least 11 of the
18 specified tender points which cluster around the neck and shoulder, chest, hip,
knee, and elbow regions." Other typical symptoms, some of which can be signs if
they have been clinically documented over time, are irritable bowel syndrome,
chronic headaches, temporomandibular joint dysfunction, sleep disorder, severe
fatigue, and cognitive dysfunction.

May 11, 1998, SSA Memorandum; *In Re: Fibromyalgia, Chronic Fatigue Syndrome Objective
Medical Evidence Requirements for Disability Adjudication*.

In the instant case, at least three physicians, including the consultative examiner, Dr. Hebert,

12

have diagnosed fibromyalgia.  (*See e.g.*, Tr. 180-183, 220, & 225).[10]  Adams also exhibited most of the symptoms related to fibromyalgia including, headaches, sleep disorder, severe fatigue, and cognitive dysfunction.  (Tr. 250-252).

The ALJ further stated that Adams did not contend that she was as profoundly restricted as Dr. Coleman's December 19, 2006, medical statement implied.  (Tr. 280).  Yet, this observation seems to contradict the ALJ's assertion that plaintiff alleged a "near invalid lifestyle."  (Tr. 280).  Indeed, during the initial hearing, the ALJ pretermitted any testimony regarding plaintiff's functional capacity due to her statement that her impairments caused her to spend three to four days per week in bed.  (Tr. 43).  The ALJ also remarked that plaintiff's mental impairments only resulted in moderate and marked limitations of function.  (Tr. 280). However, the ALJ did not explain why plaintiff's limitations stemming from her mental impairments are relevant to the physical limitations assessed by her treating physician.

The ALJ further observed that treating physicians typically accept at face value their patient's complaints.  (*See*, Tr. 280).  Of course, the same argument could be asserted in every case.  Yet, the Commissioner's regulations state that generally more weight is accorded to the opinions of treating sources.  20 C.F.R. § 404.1527(d)(2).  If, as the ALJ suggests, treating physicians are likely to be unduly influenced by their patients, then it would stand to reason that the regulations would generally assign little or no weight to a treating physician's opinion.

In discounting Dr. Coleman's opinion, the ALJ further emphasized that plaintiff reported positive results from epidural injections and physical therapy.  (Tr. 280).  However, the record contains evidence that plaintiff did not obtain relief from the injections or physical therapy.  (*See*,

---

[10]  Hebert diagnosed "probable fibromyalgia" as the primary source of Adams' pain.  (Tr. 182).

Tr. 167, 169-172, 210).  The ALJ also noted that clinical notes showed no marked functional limitations from a physical perspective.  Yet, in their assessment of fibromyalgia, courts have recognized that

> [i]n stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results-a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.  Hence, the absence of swelling joints or other orthopedic and neurologic deficits is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced.  Rather, these negative findings simply confirm a diagnosis of fibromyalgia by a process of exclusion, eliminating other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue.

*Green-Younger*, 335 F.2d at 108-109 (citations and internal quotation marks omitted).

Moreover, medical opinions that are premised upon the lack of objective findings are not particularly relevant when assessing the effects of fibromyalgia.  *See, Rogers v. Commissioner of Social Security*, 486 F.3d 234, 245 (6th Cir. 2007).   Thus, Hebert's examination findings do not provide a reliable foundation for undermining the limitations recognized by plaintiff's treating physician.

Ordinarily, a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." 20 C.F.R. § 404.1527(d)(2).  "'[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'"  *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted).  However, an ALJ cannot reject a medical opinion without an explanation supported by good cause. *See, Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).  Here, the ALJ has not provided good cause for rejecting the limitations recognized by plaintiff's treating physician.  The continued vitality of the treating physician's

14

assessment materially undermines the ALJ's residual functional capacity determination.[11]

Because the foundation for the ALJ's Step Five determination was premised upon a residual functional capacity which is not supported by substantial evidence, the undersigned finds that the ALJ's ultimate conclusion that plaintiff is not disabled, is likewise not supported by substantial evidence.[12]  Accordingly,

_____

[11]  This does not mean that upon remand the ALJ is obliged to credit the limitations recognized by plaintiff's treating physician.  If the matter is not resolved at Step Three of the sequential analysis (*see*, discussion, *infra*) further development may provide valid grounds for discounting the opinions.  For instance, a rheumatology specialist may be able to examine plaintiff, review her extensive treatment records, and then provide a well-reasoned assessment of the limitations imposed by her impairment(s).

[12]  Although not raised by plaintiff as an assignment of error, the court is compelled to observe that the ALJ's Step Three determination does not appear to be supported by substantial evidence.  The ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process.  *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (citing 42 U.S.C. § 405(b)(1)).  Here, the ALJ simply recited the requirements for Listing 12.04, and summarily concluded that plaintiff did not satisfy them.  (Tr. 277).  The instant ALJ's cursory findings at Step Three do not adequately explain the reasons for his determination.  *Audler, supra*.  Nonetheless, this omission does not require remand unless the claimant's "substantial rights" were affected.  *Id*.  A claimant's substantial rights are affected at Step Three when she demonstrates that she meets, or at least appears to meet, the requirements for a Listing.  *See, Audler, supra*.
      In this case, the ALJ essentially adopted the functional limitations stemming from plaintiff's mental impairments as recognized by E. H. Baker, Ph.D., pursuant to an October 19, 2004, mental status examination.  (Tr. 241-247).  Dr. Baker diagnosed *inter alia*, depression with marked and moderate limitation of function.  *Id*.  Moreover, the ALJ implicitly determined that her condition has lasted at least two years when he found in 2007 that she suffered from depression.  (Tr. 277).  Adams also takes medication for her condition.  (Tr. 74).  Moreover, there is evidence that Adams has lived and will continue to live in a highly supported living environment provided by her husband.  (*See*, Tr. 244, 41-43, 46-47, 325).  In other words, the record contains evidence that plaintiff meets Listing 12.04C, 20 C.F.R. Subpart P, App. 1.
      It also is not clear that plaintiff does not meet the B criteria of Listing 12.04.  The ALJ *sua sponte* determined that Adams suffered no more than moderate limitations in her:  activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace.  (Tr. 277).  However, Dr. Baker opined that her sustained concentration was "minimally adequate," and that persistence and social interaction were "marginal."  (Tr. 244).  Whether "minimally adequate" and "marginal" translate to a serious, i.e. marked, limitation is

IT IS RECOMMENDED that the matter be REVERSED and REMANDED for further proceedings consistent herein.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 2nd day of July, 2008.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE

---

best answered by Dr. Baker.  The Commissioner may address these concerns upon remand.

16